## Prusak Estate

Before Klein, P. J., Bolger, Lefever, Saylor, Shoyer and Burke, JJ.

The facts appear from the following extracts from the adjudication of

KLEIN, P. J., December 26, 1962.—John Prusak died on June 23, 1959, unmarried, leaving a will which was admitted to probate on July 2, 1959, when letters testamentary were granted. Proof of advertisement of notice thereof was produced to the auditing judge.

By his will testator, after directing the payment of his debts and funeral expenses, bequeathed "to Mrs.

Julia Krawchak, nee Shalock, the sum of $1.00 in cash," and stated that the said bequest was made "inasmuch as it has been alleged that the said Julia Krawchak" was his illegitimate daughter. The residue of his estate he devised and bequeathed to his wife, Anna Prusak, absolutely. A copy of the will, certified by counsel to be true and correct, is annexed hereto.

All parties in interest are stated to have received notice of the audit.

Decedent's wife, Anna Prusak, the sole residuary legatee, is stated to have predeceased him on April 3, 1959. Decedent is therefore deemed to have died intestate with respect to his residuary estate, in accordance with the provisions of section 1 of the Intestate Act of 1947.

The receipt, duly sealed and signed by the register of wills, for inheritance tax at 15 percent in the sum of $8,586.73, was produced to the auditing judge, and credit for payment of same will be allowed, as requested, in this adjudication.

Kate Myron, of 384 East Tenth Street, New York City, claimed to be a first cousin of decedent, entitled to his entire estate under the intestate laws as his sole surviving next of kin. She testified before the auditing judge on March 22, 1962. Her counsel, Norman S. Berson, Esq., informed the court that she died shortly thereafter.

Claimant was an illiterate, who spoke broken English. The auditing judge was impressed with her candor and frankness on the witness stand and accepts her evidence as trustworthy and truthful. The following facts can be gathered from her testimony. She was born in Bolotnia on September 26, 1888. Her mother was Anna Alexias and her father, Sloka Wyluschak, both of whom died many years ago. She had one sister, Evdokia, who is also dead. Her mother had one sister, Maria Alexias, and no brothers. Claimant's mother

died when she was 12 years old, and she went to live with her aunt, Maria. She stayed with her for eight years until she came to this country in 1908. Her Aunt Maria was married twice. First, to Feodor Prusak, who died when claimant was a child, and then to Matoi Demcovitch. Maria had four children by her first husband: Anna, Feodor, Anastasia, and Ivan (or John), the decedent. She had two children by her second husband: a son, Mikhail, and a daughter, Eva, who died at the age of four.

There can be little question that Kate Myron is a first cousin of John Prusak, the decedent. They were raised together in Europe and had a close family relationship in this country. Photographs were offered in evidence showing decedent as part of claimant's family group.

Claimant was supported in her position by the testimony of her daughter, Mae Targon, and Stephen Hill, a friend of decedent.

The auditing judge is satisfied and finds as a fact that Kate Myron was a first cousin of John Prusak, decedent, but is also satisfied that he was survived by closer relatives residing somewhere in Europe behind the Iron Curtain.

Marvin S. Baker, Esq., of the law firm of Ostroff, Lawler and Baker, appeared on behalf of Nikolai Fedorovich Prusak, Evdokia Fedorovna Dmitriv, Ivan Andreevich Ivanishin, Ekaterina Andreevna Cherkas, Maria Andreevna Rymovskaya, Maria Ivanovna Prusak, Evdokia Ivanovna Kowal, Ekaterina Ivanovna Tzuper, Emilia Ivanovna Kowal, and Fedor Ivanovich Kowal, who allege that they are nieces and nephews of decedent, entitled to this distributive balance of his estate as his surviving next of kin under the intestate laws.

Mr. Baker submitted for the record, in support of these claims, a family tree of decedent, John Prusak,

which claimants contend supports their claims of relationship. This chart indicates that decedent's parents were Fedor Mikoloaevich Prusak and Maria Pavlovna Prusak, who died in 1889 and 1917, respectively. The chart indicates, further, that four children were born of this marriage: Anastasia (born 1877, died 1919); Feder (born 1880; died 1923); Ivan, also known as John, the decedent (born 1883, died 1959); and Anna (born 1886, died 1920).

According to the family tree, Anastasia married Andrei Grigorievich Ivanishin in 1896 and had three children: Ivan (born 1900); Katerina (born 1904 and married to Mikhail Vasilievich Cherkas); and Maria (born 1907 and married to Grigory Timofeevich Rymovskaya). Fedor is alleged to have married Melaina Dimitrievna Senishin in 1906 and had two children: Nikolai (born 1909) and Evdokia (born 1912 and married to Vasily Fedorovich Dmitriv). Anna is stated to have married Ivan Vasilievich Koval (or Kowal) in 1904 and had five children: Maria (born 1908 and married to Vasily Nikolaevich Prusak in 1924); Evdokia (born 1911); Ekaterina (born 1913 and married to Dmitry Nikolaevich Tsuper); Emilia (born 1915); and Fedor (born 1918). All of the foregoing nieces and nephews are stated to be living in Russia.

It should be noted that the fact that decedent's mother's name was Maria and his father's was Fedor is confirmed by the testimony of Kate Myron, whom the auditing judge has found to be a first cousin of decedent. She also confirmed the allegation that decedent had a brother, Fedor, and two sisters, Anastasia and Anna. Kate Myron testified further, however, that upon the death of decedent's father, Fedor, his mother married Matoi Demcovitch and that two children were born of the second marriage, a son, Mikhail, and a daughter, Eva, who died at the age of four. No mention is made by claimants of the second mariage or of Mikhail, who,

if living, would be decedent's brother of the half-blood.

This court has on several occasions expressed its concern with respect to the validity of documents from Iron Curtain countries submitted to establish kinship to local decedents because of the possible fraud, coercion or other invalidating circumstances attending their execution: Sobko Estate, 88 D. & C. 76 (1954); Zupko Estate, 15 D. & C. 2d 442 (1958); Martinzik Estate, 25 D. & C. 2d 701 (1962). See also Nikas Estate, 28 D. & C. 2d 151 (1962); Stevens Estate, 28 D. & C. 2d 658 (1962).

The instant case is a good example of why American courts should be exceedingly cautious in accepting documents from communist-dominated countries in cases where kinship to an American decedent is in issue. The auditing judge is satisfied that when John Prusak died in Philadelphia on June 24, 1959, he was survived by some nieces and nephews residing in Russia. He has, however, the greatest doubt concerning the identity of the persons who are now making claims.

In the first place, many of the documents upon which claimants rely were prepared in 1960 and 1961, many years after the birth, death, marriages and similar events which they purport to establish took place. It is obvious that all of these documents were prepared *post litem motam*, solely for the purpose of these proceedings. When these documents are examined closely, it is highly improbable that they represent correct information concerning the events in question. It seems clear that they were reconstructed to meet the requirements of this case from hearsay information supplied by interested claimants. They certainly cannot be accepted as supplying reliable and credible evidence of the relationship of claimants to John Prusak, the decedent.

There are several significant aspects of this case which cast grave suspicion upon the authenticity of these documents and upon claimants themselves.

Mr. Baker offered in evidence two papers, designated "Power of Attorney" appointing Wolf, Popper, Ross, Wolf & Jones, Attorneys at Law, of 635 Madison Avenue, New York 22, New York, as attorneys giving them wide powers in presenting the claims of the signatories and in collecting the shares of the estate to which they are entitled. One of these documents purports to bear the signatures of Nikolai (Mikola) Fedorovich Prusak, Evdokia Fedorovana Dmitriv, Ivan Andreevich Ivanishin, Ekaterina Andreevna Cherkas, and Maria Andreevna Rymovskaya. The second power purports to bear the signatures of Maria Ivanovna Prusak, Evdokia Ivanovna Kowal, Ekaterina Ivanovna Tzuper, Emilia Ivanovna Kowal, and Fedor Ivanovich Kowal. Both documents were apparently executed before the same notary, who certified that both were executed by the persons designated, "residing at the Village of Bolotnia, Peremyshliansky District, Lvovakaya Province, Ukrainian SSR, whose identity, the authenticity of whose signatures, as well as whose legal capacity and capability have been ascertained." The two documents were duly authenticated by the proper Soviet officials and by Richard E. Snyder, American Consul in Moscow.

On the surface, these papers appear to be proper and authentic in every way and entitled to careful consideration. However, a letter was found among decedent's effects, stating that it was written by a daughter of Nikolai Fedorovich Prusak, which casts grave doubts upon the identity of the persons who executed these powers. In this letter she says that she is writing for her father because he is unable to write. Nevertheless, his signature appears on the first power of attorney. She also stated in the letter that Ivan Ivanishin is dead. In spite of this, his signature appears on the power.

The other power of attorney bears the signature of Emilia Ivanovna Kowal. Counsel for the Common-

wealth offered in evidence a letter apparently written by her and received by the executor wherein she states that she did not at any time sign a power of attorney for anyone to represent her interest in this estate, that the name on the document is her maiden name, and that she married in 1947.

Perhaps the information in these letters is incorrect, but can we disregard it under the circumstances of this case? These claimants reside many thousands of miles from Philadelphia, and it is well nigh impossible for us to check the validity of the papers they present.

Mr. Baker very frankly admitted that "there are definite discrepancies in these matters which we are completely aware of and do not try to hide." If these claimants were residents of the Commonwealth of Pennsylvania, it is clear that we could not make a finding, upon the proofs here submitted, that they have satisfactorily established their identity as next of kin of our decedent. Certainly we would not be justified in giving more favorable consideration to a Russian national than to our own citizens. See Stevens Estate, supra, in which we said, at page 664:

". . . On the contrary, a duty devolves upon American courts, when claimants live in communist-controlled countries, to make certain that every safeguard is taken and that the rules of evidence are scrupulously observed to prevent the proceeds of the estates of our decedents from being awarded to persons not legally entitled thereto."

The auditing judge has reached the conclusion, after a careful study of this record, that the claimants represented by Mr. Baker have failed to establish by satisfactory proofs that they are the next of kin of John Prusak, the decedent.

The balance of principal will be awarded to the Commonwealth of Pennsylvania for payment into the

State treasury, without escheat, pursuant to section 1314 of the Fiscal Code of April 9, 1929, P. L. 343. The said award, however, will be made, without prejudice to the rights of any party in interest to establish a claim, in a future proceeding, that he is related to decedent entitled to participate in the distribution under the intestate laws and to prove his identity in accordance with the requirements of our law.

When decedent died on June 23, 1959, he had $14,326.77 on deposit in his name in savings account no. 324,858 in The Dime Savings Bank of Williamsburgh, located in Brooklyn, New York. The pass book was in the possession of Alfred Ottaviano, who delivered it to Arnold M. Blumberg, the executor. At the audit on May 10, 1961, William B. Eagan, Esq., appeared for Mr. Ottaviano and made claim for the proceeds of this savings account based upon a valid inter-vivos gift alleged to have been made by decedent on or about June 16, 1959. Mr. Eagan asserted that "the deceased did at the same time and place deliver to the claimant a signed writing directed to the bank, directing the bank to give all the funds in this account to the claimant, Alfred Ottaviano."

Claimant called one witness, Robert Grantano, a police officer employed by the City of Philadelphia, in support of his claim. Mr. Grantano testified that he considered himself a good friend of claimant, who was a barber and owned a shop located at 333 South Fourth Street, which was within the beat he patrolled. He said he knew John Prusak for "close to ten years," having met him in claimant's barber shop, and that "he used to come in the barber shop. As a matter of fact, he almost always was with Mr. Ottaviano." Mr. Grantano testified, further, that approximately one week before decedent died, on Tuesday morning, he went to claimant's barber shop for a haircut. When he "got there, Mr. Prusak had just come in. He sat down in the

barber's chair. . . . . Just about the time that Mr. Ottaviano finished his haircut Mr. Prusak got up. . . . He handed Mr Ottaviano this tan envelope. He said, 'Freddie, I want you to have this. This is for you.' "

Mr. Grantano continued, "After Mr. Prusak left Mr. Ottaviano opened the envelope. It was a bankbook and a letter." The witness stated that the book was from "Dime Savings Bank of New York City" and "the letter was addressed to the bank and it said to 'please transfer this amount to my friend, Freddie Ottaviano' and it was signed 'John Prusak'."

This, in substance, is the claimant's case. Unfortunately for claimant, however, he cannot produce the writing which he claims was given to him by decedent directing The Dime Savings Bank of Williamsburgh to deliver to him the funds in the account in question. Moreover the disappearance of the letter was not satisfactorily explained. He merely stated that it does not presently exist and that it was "lost somewhere." It is doubtful from a study of this testimony that Alfred Ottaviano, the claimant, has established his claim with the degree of proof required under the law. However, there can be no question that he was a very close friend of decedent who took care of him in his last illness. It is also probable that if decedent had lived longer he would have drawn a will disposing of most of his estate in favor of the claimant. In view of these circumstances, the auditing judge suggested to counsel that the matter be compromised and a figure of $2,500 was agreed upon by counsel for all parties in interest except Mr. Baker, who objected thereto. The auditing judge is strongly of the opinion that this settlement is fair and reasonable under the circumstances of this case, and it will be approved by him in spite of Mr. Baker's objection for two reasons.

Section 513 of the Fiduciaries Act of April 18, 1949, P. L. 512, provides as follows:

"Whenever it shall be proposed to compromise or settle any claim, whether in suit or not, by or against the estate of a decedent, or to compromise or settle any question or dispute concerning the validity or construction of any will, or the distribution of all or any part of any decedent's estate, or any other controversy affecting any estate, the court, on petition by the personal representative or by any party in interest setting forth all the facts and circumstances, and after such notice as the court shall direct, aided if necessary by the report of a master, may enter a decree authorizing the compromise or settlement to be made."

If the personal representatives ask for approval of the settlement, the court has authority to do so, even if some of the parties who may be in interest do not agree thereto. If unanimity of all the parties in interest were required in order to compromise a claim against an estate, it would often prevent an orderly administration. However, there is a second and equally cogent reason for ignoring Mr. Baker's objection. He has not proved to the court's satisfaction the claims of relationship of the parties for whom he has entered an appearance. The court cannot, therefore, permit his objection to delay further the completion of the administration of this estate. Accordingly, there will be awarded to claimant, Alfred Ottaviano, the sum of $2,500 in full settlement of his claim. . . .

And now, December 26, 1962, the account is confirmed nisi.

*Norman S. Berson,* for exceptant.
*Morton S. Powlen,* contra.
*Sydney J. Fires,* for Commonwealth.

### Opinion sur Exceptions

LEFEVER, J., February 21, 1963.—The learned auditing judge in his adjudication decided, inter alia, that (1) Kate Myron was a first cousin of decedent; (2) "when John Prusak died in Philadelphia on June 24,

1959, he was survived by some nieces and nephews residing in Russia"; and (3) that these latter claimants had not met the burden of proving their identity as decedent's nephews and nieces. He therefore awarded decedent's estate of $41,805.06 "to the Commonwealth of Pennsylvania for payment into the State treasury, without escheat, pursuant to section 1314 of the Fiscal Code of April 9, 1929, P. L. 343, without prejudice to the rights of any party in interest to establish a claim, in a future proceeding, that he is related to decedent entitled to participate in the distribution under the intestate laws and to prove his identity in accordance with the requirements of our law."

The administratrix of the estate of Kate Myron, who is now deceased, filed the exceptions now before the court. Exceptant takes the position that since the auditing judge ruled that the proofs of the claimants were not sufficient to satisfactorily identify them as nephews and nieces, the claims of *all* nephews and nieces were "disallowed" and, therefore, the estate should have been awarded to exceptant.

We have carefully reviewed the record. There is little that we can profitably add to the comprehensive, carefully considered and able adjudication of the learned auditing judge.

We all agree that the record strongly indicates that one or more nephews and nieces in Russia survived decedent, even though their specific identity remains to be proved to the satisfaction of the auditing judge. We are fortified in this opinion by the family tree which was offered by the Russian claimants at the audit, which Kate Myron corroborated in substantial parts. Under the Intestate Act of 1947, nephews and nieces take to the exclusion of first cousins. Therefore, notwithstanding the finding of the auditing judge that Kate Myron was the surviving first cousin, neither she nor her estate has an interest in view of his finding as to the existence of nephews and nieces.

It is the common experience of this court that claimants residing in Russia or other so-called Iron Curtain countries find it difficult, if not impossible, to prove their identity in accordance with the rules of evidence which govern our practice. In such cases, we customarily award the funds to which claimants may be entitled to the State treasury, without escheat, pursuant to the above mentioned section 1314 of the Fiscal Code: Martinzik Estate, 25 D. & C. 2d 701. The auditing judge so awarded the funds in the instant case. This was proper.

Such award preserves the rights of the nephews and nieces until such time as they are in position to prove their identity. Moreover, in the highly unlikely event that the exceptant should ever be able to prove that no nephews or nieces survived decedent, appropriate award could then be made to the estate of Kate Myron, deceased.

Accordingly, for the reasons herein stated and those set forth by the learned auditing judge in his adjudication, the exceptions are dismissed and the adjudication is confirmed absolutely.